## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK DIVISION

| | |
|---|---|
| JOANNE NEALE, KERI HAY, KELLY MCGARY, SVEIN A. BERG, GREGORY P. BURNS, DAVID TAFT, JEFFREY KRUGER and KAREN COLLOPY individually and on behalf of others similarly situated,<br><br>                              Plaintiffs,<br><br>       vs.<br><br>VOLVO CARS OF NORTH AMERICA, LLC, and VOLVO CAR CORPORATION,<br><br>                              Defendants. | No. 2:10-cv-04407-DMC-MF<br><br><br>**CLASS ACTION**<br><br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Joanne Neale, Keri Hay, Kelly McGary, Svein A. Berg, Gregory P. Burns, David Taft, Jeffrey Kruger, and Karen Collopy (together, "Plaintiffs"), bring this action against Defendants Volvo Cars of North America, LLC ("VCNA") and Volvo Car Corporation ("VCC") (collectively "Defendants" or "Volvo"), by and through their attorneys, individually and behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

1.      This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a nationwide class of current and former Volvo vehicle owners and

lessees with defective sunroof drainage systems in the following Volvo vehicle models: S40, S60, S80, V50, V70, and XC90 vehicles (the "Class Vehicles").[1]

2.    This action arises from Defendants' failure, despite their longstanding knowledge of a material design defect, to disclose to Plaintiffs and other consumers that the Class Vehicles are predisposed to a sunroof drainage system defect (collectively, the "Sunroof Drainage Defect"), which leads to the accumulation of dirt, debris, and other naturally occurring particles within the sunroof water drainage system, as well as the kinking of tubing within the drainage system. This defect – which typically manifests shortly after the limited warranty period has expired – will inevitably cause extensive damage to the Class Vehicles by allowing an ingress of water.  This water, which is intended to be directed to the exterior of the vehicle, instead ends up within the passenger compartment of the Class Vehicles.  Significantly, when the Sunroof Drainage Defect occurs it poses a safety risk to the operator of the vehicle since the ingress of water can damage important electrical items and/or sensors.

3.    Not only did Volvo actively conceal the fact that particular components within the sunroof drainage system are defective (and require costly repairs to fix), but they did not reveal that the existence of this defect would diminish the intrinsic and resale value of the vehicles, as well as potentially cause

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models included in the Class Vehicles after conducting discovery.

rust and water damage to surrounding electronic components and a resulting safety concern.

4.      Volvo has long been well aware of the Sunroof Drainage Defect. Indeed, it has issued Technical Service Bulletins in attempts to address this very problem in many of the Class Vehicles.  Yet notwithstanding its longstanding knowledge of this design defect, Volvo has routinely refused to repair the Vehicles without charge when the defect manifests.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§1332(d)(2) and (6) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendant VCNA has a North American headquarters in this jurisdiction, transacts business in this district, is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district.  Additionally, both Defendants have advertised in this district and have received substantial revenue

and profits from their sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

7.     This Court has personal jurisdiction over Defendants VCC and VCNA.  Defendants' North American corporate headquarters is located in Rockleigh, New Jersey.  As such, they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the districts of New Jersey and throughout the United States.

## THE PARTIES

### The Plaintiffs

### A.     Plaintiff Neale

8.     Plaintiff Joanne Neale ("Neale") is a citizen of the Commonwealth of Massachusetts, residing at 44 Dartmouth Avenue, Needham, Massachusetts, 02494.

9.     In or around 2008, Plaintiff Neale purchased a pre-owned 2005 Volvo V50 5-door wagon from Dalzell Volvo.[2]

---

[2] Volvo acknowledges that owners who have purchased a previously owned Volvo on which the New Vehicle Warranty has not expired are entitled to the remaining portion of that warranty. *See* 2004 Volvo Warranty and Service Records Information, p.6.  As such, it makes no difference that some plaintiffs and putative class members have purchased a pre-owned (as opposed to a new) vehicle.

10.     Plaintiff Neale purchased (and still owns) this vehicle, which is used for personal, family and/or household uses.  Her vehicle bears Vehicle Identification Number: YV1MW300152088003.

11.     On or around March 2010, Neale noticed that her interior carpet was wet and she heard a "sloshing" sound when braking and turning corners.  Soon thereafter, Neale brought her vehicle to Dalzell Volvo, an authorized Volvo dealer and service center located in Dedham, Massachusetts to diagnose such sound.  At the time she brought her vehicle into Dalzell Volvo, it had approximately 32,000 miles.

12.     The Dalzell Volvo technician informed Neale that she was experiencing a common problem with the sunroofs in Volvo vehicles.  Neale was charged approximately $592.00 for service associated with an attempt to repair the Sunroof Drainage Defect in her vehicle.

13.     Furthermore, Neale was informed by Dalzell Volvo Service Advisor, Matthew Garron, that the service and repairs associated with the Sunroof Drainage Defect in her vehicle would not be covered under her vehicle warranty since the problem was allegedly caused by "an outside influence."

14.     Plaintiff Neale has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Sunroof Drainage Defect, including, but not limited to, out of pocket loss associated with

the Sunroof Drainage Defect and attempted repairs in her vehicle.

15.     None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of the existence of the Sunroof Drainage Defect and/or defective vehicle design prior to purchase.

**B.     Plaintiff Hay**

16.     Plaintiff Keri Hay ("Hay") is a citizen of the State of Maryland, residing at 7421 Cinnabar Terrace, Gathersburg, Maryland, 20879.

17.     In or around 2008, Plaintiff Hay purchased a pre-owned 2005 Volvo XC90 from Darcars Volvo of Rockville.

18.     Plaintiff Hay purchased (and still owns) this vehicle, which is used for personal, family and/or household uses.  Her vehicle bears Vehicle Identification Number: YV1CZ592751170744.

19.     On or around May 27, 2009, Hay noticed that the rear floor mats in her vehicle were soaking wet.  Soon thereafter, Hay brought her vehicle to Darcars Volvo, an authorized Volvo dealer and service center located in Rockville, Maryland.  At the time she brought her vehicle into Darcars Volvo, it had approximately 48,000 miles.

20.     The Darcars Volvo technician told Hay that she was experiencing a common problem with the sunroof drain systems in XC90 vehicles.  Hay was charged approximately $775 for repairs associated with an attempt to repair the

Sunroof Drainage Defect in her vehicle.

21.     Furthermore, Plaintiff Hay has contacted VCNA about the Sunroof Drainage Defect within her vehicle and associated service costs she incurred; however, Volvo has been unwilling to investigate or address Plaintiff Hay's complaint.  Specifically, VCNA advised that the problem she experienced was not a "warranty issue" and in the future she should be vigilant about checking the sunroof drains for clogs.

22.     Since that time Plaintiff Hay's vehicle has suffered from electrical issues, including shorts in the steering wheel controls for the radio and CD changer.  After several months of discussions, Darcars Volvo decided to repair such issues under warranty.

23.     Plaintiff Hay has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Sunroof Drainage Defect, including, but not limited to, out of pocket loss associated with the Sunroof Drainage Defect and attempted repairs in her vehicle.

24.     None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of the existence of the Sunroof Drainage Defect and/or defective vehicle design prior to purchase.

C.    **Plaintiff McGary.**

25.    Plaintiff Kelly McGary ("McGary") is a citizen of the State of Florida, residing at 3806 S. Kenwood Avenue, Tampa, Florida 33611-1524.

26.    In or around 2004, Plaintiff McGary purchased a new 2004 Volvo XC90 T6 from Volvo of Tampa ("Volvo of Tampa") located in Tampa, Florida.

27.    Plaintiff McGary purchased (and still owns) this vehicle, which is used for personal, family and/or household uses.  Her vehicle bears Vehicle Identification Number: YV1CZ91H741105088.

28.    On or around December 19, 2009, McGary brought her car into Volvo of Tampa because water was leaking into in the driver door area.  She was charged over $600 for service associated with an attempt to repair the Sunroof Drainage Defect.  Her invoice states: "SUNFOOF DRAINS BLOCKED REMOVED A PILLARS AND MODIFIED SUN ROOF DRAINS.  REMOVED FRONT AND REAR CARPETS TO DRY."  At the time she brought her vehicle into Volvo of Tampa, it had approximately 57,643 miles.

29.    Plaintiff McGary experienced the Sunroof Drainage Defect again in or around January of 2010.  This time, she brought her vehicle back to Volvo of Tampa and was charged over $100 for labor associated with the Sunroof Drainage Defect.  When she brought her car into the dealer in January of 2010, the vehicle had approximately 58,596 miles.

30.     Plaintiff McGary has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Sunroof Drainage Defect, including, but not limited to, out of pocket loss associated with the Sunroof Drainage Defect and attempted repairs in her class vehicle.

31.     None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of the existence of the Sunroof Drainage Defect and/or defective vehicle design.

**D.     Plaintiff Berg**

32.     Plaintiff Svein A. Berg ("Berg") currently resides in the State of New York.  At the time he purchased his 2004 Volvo XC90 in January 2008 in Hawaii, he was a resident of Hawaii.

33.     Berg bought his vehicle from Pflueger Acura in Honolulu, Hawaii.  It was a pre-owned vehicle with approximately 30,000 miles.

34.      Plaintiff Berg purchased his vehicle for personal, family and/or household uses.  His vehicle bears Vehicle Identification Number: YV1CZ91H241045172.

35.     In or around August of 2009, Berg had to take his vehicle to a Volvo certified repair shop in Hawaii for repairs to his vehicle for damage caused as a result of the Sunroof Drainage Defect.  He was charged nearly $1,000 for diagnostics, labor and parts in connection with replacing the yaw rate sensor under

the passenger seat, which was damaged as a result of the Sunroof Drainage Defect.

36.     In or around January 2010, Berg again had to pay nearly $200 for additional repairs to his vehicle as a result of the Sunroof Drainage Defect.

37.     Plaintiff Berg has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Sunroof Drainage Defect, including, but not limited to, out of pocket loss associated with the Sunroof Drainage Defect and attempted repairs in his vehicle.

38.     None of the Defendants, nor any of their agents, dealers or other representatives informed Plaintiff Berg of the existence of the Sunroof Drainage Defect and/or defective vehicle design.

**E.     Plaintiff Burns**

39.     Plaintiff Gregory Burns ("Burns") is a citizen of the State of New Jersey, residing at 400 River Avenue, Point Pleasant Beach, New Jersey, 08742.

40.     In or around 2005, Plaintiff Burns entered into a 3-year lease agreement on a new 2006 Volvo V50 5-door wagon from Red Bank Volvo.

41.     At the expiration of the lease term, Plaintiff Burns then purchased (and still owns) this vehicle, which is used for personal, family and/or household uses.  His vehicle bears Vehicle Identification Number: YV1MW382462172787.

42.     In or around March 2010, Burns noticed a water leak in his vehicle causing water to puddle on the rear driver's side floorboard area.  Plaintiff Burns

also observed water exiting the air vent under the driver's seat of his vehicle.  Soon

thereafter, Burns brought his vehicle to Garden State Volvo ("Garden State"), an

authorized Volvo dealer and service center located in Manasquan, New Jersey, to

diagnose the issue. At the time he brought his vehicle into Garden State on May 3,

2010, it had approximately 49,000 miles.

43.     Garden State verified Plaintiff Burn's complaints and found that "the

sunroof drains [were] clogged on the [left side]."  According to the invoice, the left

side sunroof drain was "clogged solid [and would] not clean."  The technician

replaced the sound trap, reinstalled the sunroof drain, and verified the right side

was draining without issue.  Burns was charged approximately $258.82 for this

service associated with an attempt to repair the Sunroof Drainage Defect in his

vehicle.

44.     On or around April 2010, Burns noticed a water leak in his vehicle in

or around the lower portion of the passenger side dashboard associated with the

sunroof drain.  As a result, on April 26, 2010, Burns again brought his vehicle to

Garden State to diagnose the issue.  Garden State tested the right side sunroof

drains but could not duplicate the problem observed by Burns at such time.

45.     Plaintiff Burns has suffered an ascertainable loss as a result of

Defendants' omissions and/or misrepresentations associated with the Sunroof

Drainage Defect, including, but not limited to, out of pocket loss associated with

the Sunroof Drainage Defect and attempted repairs in his vehicle.

46.    None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of the existence of the Sunroof Drainage Defect and/or defective vehicle design prior to purchase.

**F.    Plaintiff Taft.**

47.    Plaintiff David Taft ("Taft") is a citizen of the State of California, residing at 45 Melanie Lane, Atherton, California 94027.

48.    In or around 2003, Plaintiff Taft purchased a new 2004 Volvo XC90 from Smythe Volvo ("Smythe Volvo") located in San Jose, California.[3]

49.    Plaintiff Taft purchased (and still owns) this vehicle, which is used for personal, family and/or household uses.  His vehicle bears Vehicle Identification Number: YV1CM59H541033805.

50.    On or around February 23, 2009, Taft brought his vehicle into Carlsen Volvo ("Carlsen Volvo"), located in Palo Alto, California, because the "Anti-Skid" light had illuminated.  The technician determined that the Differential Electronic Module ("DEM") unit had failed internally.

51.    The technician also noticed a "water leak into [the] vehicle" due to the "sunroof drain tubes [being] plugged, allowing water to stay in [the] car [and] not exit at the bottom of [the sunroof drainage] tube."  As a result, the technician

_____

[3] Smythe Volvo advertises itself as "Silicon Valley's Exclusive Volvo Retailer."

cleaned the drain tubes, reassembled the trim pieces and rechecked the system. Plaintiff Taft was charged approximately $300 for these services associated with an attempt to repair the Sunroof Drainage Defect.  At the time he brought his vehicle into Carlsen Volvo, it had approximately 32,307 miles.

52.    Plaintiff Taft experienced the Sunroof Drainage Defect again in or around February of 2011.  Specifically, the vehicle exhibited water sloshing sounds within the vehicle and also water traveling down the inside of the windshield when braking.  As a result, he brought his vehicle back to Carlsen Volvo and was charged over $700 for repairs associated with the Sunroof Drainage Defect. The technician found the "front [sunroof] drain tubes dry and shrinking."  As a result, the technician replaced the tubes, cleaned out the rear sunroof drains and "dried the carpeting and floor of car [to the] best possible."  When Plaintiff Taft brought his vehicle to Carlsen Volvo in February of 2011, the vehicle had approximately 38,788 total miles on the odometer.

53.    Plaintiff Taft experienced the Sunroof Drainage Defect again in or around May of 2012.  Specifically, the vehicle had a pooling of water behind the driver side rear seat.  As a result, he brought his vehicle to Redwood General Tire, Co. ("Redwood Tire") located in Redwood City, California.  Redwood Tire completed the necessary repairs to the Sunroof Drainage System.  Redwood Tire also located additional water under the body of the vehicle and took the necessary

measures to remove it.  Plaintiff Taft paid over $400 for these repair services.

When he brought his vehicle into Redwood Tire in May of 2012, the vehicle had

approximately 42,844 total miles.

54.    Plaintiff Taft has suffered an ascertainable loss as a result of

Defendants' omissions and/or misrepresentations associated with the Sunroof

Drainage Defect, including, but not limited to, out of pocket loss associated with

the Sunroof Drainage Defect and attempted repairs in his class vehicle.

55.    None of the Defendants, or any of their agents, dealers or other

representatives informed Plaintiff of the existence of the Sunroof Drainage Defect

and/or defective vehicle design.

**G.    Plaintiff Kruger.**

56.    Plaintiff Jeffrey Kruger ("Kruger") is a citizen of the State of

California, residing at 2624 Carisbrook Drive, Oakland, California 94611.

57.    On July 31, 2005, Plaintiff Kruger purchased a new 2005 Volvo S40

from Volvo of Pleasanton located in Pleasanton, California.[4]

58.    Plaintiff Kruger purchased (and still owns) this vehicle, which is used

primarily for personal, family and/or household uses.  His vehicle bears Vehicle

Identification Number: YV1MS390952101513.

59.    On or around January 28, 2012, when his vehicle had approximately

_____

[4]  Upon information and belief, Volvo of Pleasanton is no longer in existence.

69,240 miles on the odometer, Kruger opened the door to his vehicle and discovered standing water in the driver's-side front footwell that was approximately one (1) inch deep.  Plaintiff Kruger immediately tried to remove the water by soaking it up with a towel.

60.     Shortly thereafter, Plaintiff Kruger brought his vehicle to Precision Motors – an independent European vehicle repair specialist – to have the problem diagnosed and repaired.  The technician "found [a] plugged sunroof drain on the l[eft] side."  In order to repair his vehicle, the technician "clean[ed] sunroof drains, removed driver's seat and front carpet, lift up l[eft] r[ear] carpet and dry car out."  On February 1, 2012, Mr. Kruger paid $308.00 for such repair.

61.     Plaintiff Kruger experienced the Sunroof Drainage Defect again in or around April of 2012.  Specifically, Plaintiff Kruger had placed some belongings in the rear footwells and when he went to remove the belongings he discovered that they were wet.  Upon closer inspection, Plaintiff Kruger determined that although there was no standing water, the carpets and mats in his rear footwells were soaked with water.  Again, Plaintiff Kruger attempted to dry out the rear footwells and carpets as best possible.  He has not yet returned to Precision Motors to have the Sunroof Drainage Defect repaired again.

62.     Plaintiff Kruger has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Sunroof

Drainage Defect, including, but not limited to, out of pocket loss associated with the Sunroof Drainage Defect and attempted repair in his class vehicle.

63.    None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of the existence of the Sunroof Drainage Defect and/or defective vehicle design.

**H.    Plaintiff Collopy**

64.    Plaintiff Karen Collopy ("Collopy") is a citizen of the State of New Jersey, residing at 9 Riverside Drive, Rumson, New Jersey, 07760.

65.    In or around 2007, Plaintiff Collopy purchased a pre-owned 2007 Volvo S40 from Red Bank Volvo ("Red Bank Volvo") of Red Bank, New Jersey.

66.    Plaintiff Collopy purchased (and still owns) this vehicle, which is used for personal, family and/or household uses.  Her vehicle bears Vehicle Identification Number: YV1MS382072259549.

67.    On or around February, 2012, Collopy noticed a collection of water and mold and/or mildew within the interior compartment of her vehicle.  Soon thereafter, Collopy brought her vehicle to the Vovo Clinic ("Vovo Clinic"), an independent Volvo service center located in Red Bank, New Jersey.  At the time she brought her vehicle into Vovo Clinic, it had approximately 56,000 miles.

68.    The technician at Vovo Clinic checked her Sunroof Drainage System and discovered it was clogged and that one of the drainage tubes was completely

disconnected.  He cleaned and repaired the clogged Sunroof Drainage System and charged Collopy approximately $90.00 for the repair.

69.     In or around April 2012, Plaintiff Collopy returned to Vovo Clinic for repair.  Vovo Clinic had previously determined that the ingress of water had caused damage to her vehicle's carpeting.  Vovo Clinic replaced all carpeting and padding in the vehicle and also cleaned the floor.  Plaintiff Collopy was charged approximately $1100.00 for this service and repair related to the Sunroof Drainage Defect.

70.     Furthermore, Plaintiff Collopy has contacted VCNA on multiple occasions about the Sunroof Drainage Defect within her vehicle and associated service costs she incurred; however, Volvo has been unwilling to investigate or address Plaintiff Collopy's complaints.  Specifically, VCNA advised that the problem she experienced was not a "warranty issue" and in the future she should be vigilant about checking the sunroof drains for clogs.

71.     Plaintiff Collopy has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Sunroof Drainage Defect, including, but not limited to, out of pocket loss associated with the Sunroof Drainage Defect and attempted repairs in her vehicle.

72.     None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of the existence of the Sunroof Drainage Defect

and/or defective vehicle design prior to purchase.

### The Defendants

73.    Defendant VCNA is a corporation organized and existing under the laws of the State of New Jersey, having a principal place of business at 1 Volvo Drive, Rockleigh, New Jersey 07647, and, for purposes of 28 U.S.C. § 1441(b), is a citizen of the State of New Jersey.

74.    Defendant VCC is a Swedish corporation headquartered at S-40531 Gothenburg, Sweden.

75.    Upon information and belief, Defendant VCNA communicates with Defendant VCC concerning virtually all aspects of the Volvo products it distributes within the United States.

76.    Upon information and belief, the design, modification, installation and decisions regarding the sunroofs within the Class Vehicles were performed exclusively by Defendant(s) VCNA and/or VCC.

77.    Upon information and belief, Defendants VCNA and/or VCC develop the owner's manuals, warranty booklets and information included in maintenance recommendations and/or schedules for Class Vehicles.

78.    Defendants VCNA and VCC engage in continuous and substantial business in New Jersey.

## <u>TOLLING OF STATUTES OF LIMITATION</u>

79.   Any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and members of the class could not have reasonably discovered the true, latent defective nature of the Sunroof Drainage Defect until shortly before this class action litigation was commenced.

80.   Defendants were and remain under a continuing duty to disclose to Plaintiff and members of the class the true character, quality and nature of the Class Vehicles, that this defect is based on a poor design, and that it will require costly repairs, poses a safety concern, and diminishes the resale value of the Class Vehicles.  As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

# FACTUAL ALLEGATIONS

## A.      The Defective Sunroof Design within the Class Vehicles.

81.     The standard features offered by Volvo in the Class Vehicles varied

based on, *inter alia*, Class Vehicle engine platforms and model.

82.     One such available feature in the Class Vehicles was a "power glass

moonroof," an electronically controlled sliding panel of transparent glass within

the roof structure of the vehicle.  Through its own consumer provided literature,

Volvo also refers to this "power glass moonroof" as a "sunroof."[5]

83.     As to the XC90 model, a power glass moonroof was included as a

standard feature in the more expensive T6 platform.[6]  A "power glass moonroof"

was only available in the T5 platform when a customer purchased the optional

"2.5T Premium Package" which also included leather seating, in-dash 6-CD

player, auto-dim rearview mirror, Homelink®, memory rearview mirrors, and 8-

way power front seats.[7]

84.     Automobiles must incorporate designs that are able to withstand

foreseeable environmental and usage conditions such as dirt, debris, washing, rain,

---

[5] *See* 2004 XC90 Warranty and Service Records Information, pp.64-65. Use of
the term "sunroof" within the Plaintiffs' complaint shall also be inclusive of
Volvo's reference to "moonroof." *See Also*, 2005 S40 Sales Brochure, pp.28-29,
32; 2005 V50 Sales Brochure, pp.28-29, 32; 2005 S60 Sales Brochure, pp.31-32;
2007 S80 Sales Brochure, pp.32-34; 2007 V70 Sales Brochure, pp.28, 37.
[6] 2003 Volvo XC90 Sales Brochure, p.32; 2004 Volvo XC90 Sales Brochure, 2nd
Edition, p.36; 2005 Volvo XC90 Sales Brochure, p.36.
[7] *Id.*

and snow.  A vehicle can suffer extensive damage and costly repairs from customary environmental and usage conditions when an insufficient vehicle design is implemented.

85.    A vehicle's sunroof must be designed and should be able to withstand foreseeable environmental and usage conditions such as dirt, debris, washing, rain, and snow.

86.    The Class Vehicle sunroofs incorporate the use of drain holes, drain tubes and sound traps in an attempt to direct water from the sunroof tray – located directly underneath the sunroof - to the underside of the vehicle.  The Class Vehicle sunroof drainage systems are designed to carry water from the exterior sunroof drain holes through the interior passenger compartment, via drainage tubes placed behind the vehicle's headliner and pillar panels, so that water will ultimately be redirected to the exterior of the vehicle through the underside.  A properly designed sunroof drainage system should allow water to drain and/or become redirected to the exterior of the vehicle in order to prevent water from entering and/or becoming trapped within the passenger compartment.

87.    As seen below, the sunroof drainage systems contained in the Class Vehicles harbor a defect which allows water – that should be directed to the exterior of the vehicle – to instead become entrapped within the passenger compartment floorboards, causing damage to the vehicles, including interior

components, carpet(s), electronic components and wiring.[8]



88.    All Class Vehicles came with Volvo's Dynamic Stability and Traction

Control ("DSTC") as standard and/or optional equipment.  As explained in

Volvo's customer literature, the DSTC system "*increases driving safety on very*

*winding roads and in slippery conditions.  If one of the driven wheels shows any*

*tendency to lose traction, power to that wheel is cut at lightning speed so that it*

*quickly regains traction.  And should the vehicle show any tendency to skid, the*

*DSTC system responds instantly by reducing engine power and braking the*

*appropriate wheels to help you maintain smooth control*."[9]

89.    To help reduce the risk of rollover, the XC90 Class Vehicle is also

---

[8]
http://www.v70xc.com/forums/showthread.php?s=09a08b65fb83bb78ccfd37d1c47
98f82&t=11173&page=2
[9] 2005 Volvo XC90 Sales Brochure, p.20; *See Also*,  2005 Volvo S40 Sales
Brochure, p.32; 2005 Volvo V50 Sales Brochure, p.32; 2005 Volvo S60 Sales
Brochure, p.34; 2007 Volvo S80 Sales Brochure, p.13; 2007 Volvo V70 Sales
Brochure, pp.16-17.

equipped with an active Roll Stability Control ("RSC").  If the RSC senses that the vehicle is starting to tip then the DSTC is instantly activated, engine power is reduced, and braking is applied to one or more of the wheels to help regain stability.[10]

90.    The DSTC and RSC features offered in the Class Vehicles play an important role in decreasing the risk of vehicle accidents and increasing driving safety.  However, both the DSTC and RSC systems are compromised as a result of the Sunroof Drainage Defect.

91.    Volvo's implementation of the DSTC in the Class Vehicles is a design widely known within the automotive industry as Electronic Stability Control ("ESC").  The ESC design is a safety feature that constantly monitors driver and road conditions while automatically applying the brakes to individual wheels and reducing engine power as needed to improve handling and steering control under all conditions, without the need for driver input.

92.    A typical ESC system is made up of many components and sensors including, *inter alia*, a control module, hydraulic unit, pump, pressure generator assembly, yaw rate sensor, lateral acceleration sensor, and wheel sensors.  These components work in unison as an integrated system to increase the driving safety

---

[10] 2004 Volvo XC90 Sales Brochure, 2nd Edition, p.36; *See Also*,  2005 Volvo S40 Sales Brochure, p.32; 2005 Volvo V50 Sales Brochure, p.32; 2005 Volvo S60 Sales Brochure, p.34; 2007 Volvo S80 Sales Brochure, p.13; 2007 Volvo V70 Sales Brochure, pp.16-17.

of the vehicle.

93.   A "yaw sensor" is an electrical component within the ESC system which detects changes in vehicle momentum – or yaw rate - that may cause a vehicle to spin out, oversteer or understeer.  These measured movements include the vehicle failing to follow the path of a desired turn despite the front wheels being turned (understeer) and also the outward sliding or fishtailing of the rear wheels in a turn (oversteer).  Both of these actions have a direct impact on the yaw rate of a vehicle which, in a vehicle equipped with ESC, is being continuously monitored by the yaw sensor.  When the yaw sensor – as a component of ESC - detects a sudden change in the yaw rate of a vehicle then it allows the ESC to take the appropriate actions needed to correct vehicle stability.

94.   In an oversteer situation, an ESC system gently applies the brakes of the outside front wheel to bring the rear end back in line with the driver's intended path.[11]

--------

[11]
http://www.google.com/imgres?imgurl=http://www.mucda.mb.ca/understeer.gif&imgrefurl=http://www.mucda.mb.ca/Stability.htm&h=293&w=190&sz=13&tbnid=JuEoU6xzscgSCM:&tbnh=115&tbnw=75&prev=/images%3Fq%3Dundersteer&zoom=1&hl=en&usg=__jBoDSy7dhZ1KQSS6PhREnxM-ZNU=&sa=X&ei=5Xx1TLaYMM_Lswbg4umXBg&ved=0CC8Q9QEwBw



In an understeer situation, the ESC system gently applies the brakes of the inside rear wheel to help the front end follow the path of the curve.[12]



95.    A non-functioning and/or damaged yaw sensor may impede or disable a vehicle's ESC system and prevent the automated adjustments needed to prevent an accident.

_____

[12] *Id.*

96.     In the Class Vehicles, the yaw sensor and related wiring are located on the passenger side floorboard, under the front passenger seat.  In some Class Vehicles, the audio system components and related wiring are also located under the front passenger seat.  These components often become water damaged as a result of the Sunroof Drainage Defect.  In turn, the yaw sensor may cease to function properly thereby causing a portion of the vehicle's ESC and/or RSC safety system to become disabled.  This poses a serious safety concern to the occupants of Class Vehicles, the occupants of other vehicles, and/or the public.

97.     Defendants' factory maintenance schedules for the Class Vehicles did not require or recommend having the sunroof drainage system cleaned or checked. As seen below, pertaining to the XC90 sunroofs, Volvo only recommends lubricating the hinges, latches, and sliding parts of the "[d]oors, hood, trunk, sunroof" every 15,000 miles and does not specify or recommend any maintenance be performed to the sunroof drainage components.[13]

---

[13] *See* 2004 XC90 Warranty and Service Records Information, pp.64-65.

## Maintenance Service Operations

| Service Operation | Schedule of Services | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **All 2004 Models*** miles x 1000 | 7.5 | 15 | 22.5 | 30 | 37.5 | 45 | 52.5 | 60 | 67.5 | 75 |
| km x 1000 | 12 | 24 | 36 | 48 | 60 | 72 | 84 | 96 | 108 | 120 |
| **Body** | | | | | | | | | | |
| Power antenna, clean/lubricate (S40 and C70 only) | | X | | X | | X | | X | | X |
| Cabin air filter, replace** | | X | | X | | X | | X | | X |
| Doors, hood, trunk, sunroof; lubricate hinges, latches, sliding parts | | X | | X | | X | | X | | X |
| **Brake System** | | | | | | | | | | |
| Brake fluid level, check | X | X | X | X | X | X | X | X | X | X |
| Brake fluid, replace*** | | | | | X | | | | | X |
| Parking brake, check/adjust | | X | | X | | X | | X | | X |
| Brake pads, check | X | X | X | X | X | X | X | X | X | X |
| Brake hoses and lines, check for damage/leaks | | | | | X | | | X | | |
| **Wheels and Tires** | | | | | | | | | | |
| Tires, check pressure, wear and condition **** | X | X | X | X | X | X | X | X | X | X |
| Tires, rotate | X | | X | | | | | | | |
| **General** | | | | | | | | | | |
| Check and replace parts or software, as required by Volvo Cars of North America, that are covered under the terms of the Volvo New Car Warranty. | | | | | | | | | | |

\*      This maintenance chart continues on page 65.
\*\*     Recommended to replace at least once a year or more often in heavy traffic or dirty/dusty areas.
\*\*\*    Recommended to replace every two years or 37,500 miles (if driven in mountainous areas or humid climates - every one year) at owner's request.
\*\*\*\*   Check spare tire pressure every two years.

## Maintenance Service Operations

| Service Operation | Schedule of Services | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **All 2004 Models Cont..** miles x 1000 | 82.5 | 90 | 97.5 | 105 | 112.5 | 120 | 127.5 | 135 | 142.5 | 150 |
| km x 1000 | 132 | 144 | 156 | 168 | 180 | 192 | 204 | 216 | 228 | 240 |
| **Body** | | | | | | | | | | |
| Power antenna, clean/lubricate (S40 and C70 only) | | X | | X | | X | | X | | X |
| Cabin air filter, replace** | | X | | X | | X | | X | | X |
| Doors, hood, trunk, sunroof; lubricate hinges, latches, sliding parts | | X | | X | | X | | X | | X |
| **Brake System** | | | | | | | | | | |
| Brake fluid level, check | X | X | X | X | X | X | X | X | X | X |
| Brake fluid, replace*** | | | | | X | | | | | X |
| Parking brake, check/adjust | | X | | X | | X | | X | | X |
| Brake pads, check | X | X | X | X | X | X | X | X | X | X |
| Brake hoses and lines, check for damage/leaks | | X | | | | X | | | | X |
| **Wheels and Tires** | | | | | | | | | | |
| Tires, check pressure, wear and condition**** | X | X | X | X | X | X | X | X | X | X |
| Tires, rotate | | | | | | | | | | |

\*\*     Recommended to replace at least once a year or more often in heavy traffic or dirty/dusty areas.
\*\*\*    Recommended to replace every two years or 37,500 miles (if driven in mountainous areas or humid climates - every one year) at owner's request.
\*\*\*\*   Check spare tire pressure every two years.

98.     Volvo, in an effort to alert Class Vehicle owners, provided a list of items on the outside back cover of the XC90 Owner's Manual that "should be checked regularly."[14]  Neither the sunroof nor sunroof drainage system were included by Volvo on this list as items that should be checked, serviced and/or

---

[14] *See* 2004 Volvo XC90 Owner's Manual, outside back cover.

cleaned regularly (*see* image below).



99.   Upon information and belief, Volvo issued Technical Service Bulletin ("TSB") No. 83-34 on or about September 2005 addressing causes of sunroof water leakage in 2003 and later model year XC90 vehicles.  *See* Exhibit A.

100.   Upon information and belief, Volvo issued TSB Retailer Technical Journal 14545 on or about October 2008 addressing causes of water intrusion into the passenger compartments of 2004.5 and later model year S40 and V50 vehicles. *See* Exhibit B.

101.   While the above TSBs appear to be limited to MY 2003 and later XC90 vehicles and MY 2004.5 and later S40 and V50 vehicles, Plaintiffs allege such "sunroof water leakage" defect issues are present in all models of Class Vehicles.

102.   TSBs are designed to provide guidance to Volvo mechanics and

service people with respect to reoccurring problems or issues. Specifically, these TSBs provided a fault tracing and service method for the most common problems pertaining to "water ingress into the passenger compartment." *Id*.

103.   These TSBs were intended to address customer complaints and symptoms of, *inter alia*, wet floor carpets, damp interior, sounds of water, water dripping from the headliner, audio module malfunctioning (due to water damage), and yaw sensor malfunctioning (due to water damage). *Id*.  Some root causes for these problems, as identified by Volvo, include the sunroof drains being clogged, the sound traps not open or clogged, and the drainage hose being kinked, clogged or loose. *Id*.

104.   The sound trap is a component of the Class Vehicles' sunroof drainage system which is located at the base of the vehicles' support pillars and connects to the drainage tube from the sunroof.  This component, when properly designed, allows water to exit the sunroof drain tube and progress towards the exterior of the vehicle, away from the interior cabin.  Volvo recommends, through these TSBs, that repair technicians verify that the sound traps are open and properly assembled.[15]

_____

[15] Picture referenced taken from TSB 83-34.



Verify if sound traps are open
and properly assembled

105.  The Class Vehicles were manufactured with insufficient and

undersized drainage openings in the sound traps.[16]  This defect was prone to

clogging of the sounds traps, thereby resulting in possible water ingress within the

passenger compartment.  Through TSB 83-34, Volvo instructs repair technicians to

modify the sound traps of certain XC90 models by enlarging the opening in an

---

[16] TSB 83-34 specifies that vehicles with chassis number between 000690-
171367 require sound trap modification.  According to Volvo, cars subsequent to
those chassis numbers were modified from the vehicle factory.  TSB Retailer
Technical Journal 14545 specifies that S40 vehicles with chassis numbers between
000001-214300 and V50 vehicles with chassis numbers between 000001-220721
require sound trap replacement.  According to Volvo, cars subsequent to those
chassis numbers were modified from the vehicle factory.  Therefore, upon
information and belief, at least 605,698 Class Vehicles were manufactured with
insufficient sound traps that are prone to clogging and require a sound trap
modification and/or replacement.

effort to prevent the sounds traps from clogging.



106.   Through TSB Retailer Technical Journal 14545, Volvo instructs repair technicians to replace the sound traps of certain S40 and V50 models with a newly designed sound trap in an effort to address issues of water intrusion.

107.   In many instances, consumers have and will incur expenses for this modification despite the defective sound traps having been contained in the Class Vehicles when manufactured by Defendants.

108.   Volvo also recommends in TSB 83-34 that repair technicians inspect and/or replace the interior drainage tubes since they are, *inter alia*, very susceptible to kinking which in turn causes sunroof drainage problems.



Check for dirt and debris and look for kinking



Critical area for kinking

109.   Volvo acknowledges the inferior quality of the sunroof drain tubes in TSB 83-34 by stating "[a] similar type of hose **with better rigidity than the original hose can be used to avoid kinking**. * Semi-rigid Polyethylene tubing. Outer ½", inner 3/8".  Manufacturer Watts (Part ref #42141525) **Available at Home Improvement Outlets or an automotive supply store**."[17]

110.   In many instances, consumers have incurred and will incur expenses for this modification despite the defective drain tubes having been contained in the Class Vehicles when manufactured by Defendants.

111.   Sunroof drainage systems are designed to function for periods (and mileages) substantially in excess of those specified in Defendants' warranties, and

[17] *See* Volvo XC90 TSB No. 83-34, issued 9/2/2005 (emphasis added).

given past experience, consumers legitimately expect to enjoy the use of an automobile without worry that the sunroof drainage system would fail for significantly longer than the limited times and mileages identified in Defendants' warranties.

112.   Upon information and belief, Defendants, through (1) their own records of customers' complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration (NHTSA), (4) warranty and post-warranty claims, and (5) other various sources, were well aware of the Sunroof Drainage Defect but failed to notify customers of the nature and extent of the problems with the Class Vehicle sunroof drainage system and failed to provide any adequate remedy.

113.   Defendants failed to adequately research, design, test and/or manufacture the sunroof drainage system before warranting, advertising, promoting, marketing, and selling it as suitable and safe for use in an intended and/or reasonably foreseeable manner.

114.   Defendants expressly warranted the affected vehicles to be free from defects for a period of 4 years or 50,000 miles.

115.   Buyers, lessees, and other owners of the affected vehicles were without access to the information concealed by Defendants as described herein, and therefore reasonably relied on Defendants' representations and warranties

regarding the quality, durability, and other material characteristics of their vehicles.

Had these buyers and lessees known of the defect and the potential danger, they

would have taken steps to avoid that danger and/or would have paid less for their

vehicles than the amounts they actually paid, or would not have purchased the

vehicles.

## B.      **Complaints by Other Class Members.**

116.   Plaintiffs' experiences are by no means isolated or outlying

occurrences.  Indeed, the internet is replete with examples of blogs and other

websites where consumers have complained of the exact same Sunroof Drainage

Defect within the Class Vehicles.[18]

## C.      **New Jersey Law Should Apply.**

117.   To the extent that it is appropriate to engage in a choice of law

analysis for purposes of deciding any motion to dismiss that may be filed by

Volvo, New Jersey's substantive laws should apply to the proposed nationwide

Class, as defined herein, because Plaintiffs properly bring this Complaint in this

District.

118.   New Jersey's substantive laws may be constitutionally applied to the

claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend., § 1,

---

[18] http://forums.swedespeed.com/showthread.php?102526
http://www.v70xc.com/forums/showthread.php?s=b899ec0531aba95b5a0eea775b8
23193&t=11173#post81851

and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution.  New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

119.  Specifically, Defendants' North American headquarters and principal place of business is located in New Jersey.  Defendant Volvo Cars of North America, LLC is registered with the New Jersey State Business Gateway Service.  And, according to its website, Volvo's Customer Care Center is located in Rockleigh, New Jersey.[19]

120.  Defendants also own property and conduct substantial business in New Jersey and, therefore, New Jersey has an interest in regulating Defendants' conduct under its laws.  Defendants' decision to reside in New Jersey and avail themselves of New Jersey's laws renders the application of New Jersey law to the claims herein constitutionally permissible.

121.  A substantial number of members of the Class also reside in New Jersey and purchased their vehicles in New Jersey.

122.  Upon information and belief, New Jersey is also the State from which Defendants' misconduct emanated.  This conduct similarly injured and affected all Plaintiffs and Class members residing in the United States.  For instance,

---

[19] http://www.volvocars.com/us/footer/contact/Pages/default.aspx

Defendants' marketing and advertising efforts were likely created in and orchestrated from the location of Defendant VCNA's present headquarters in New Jersey.  As a result, New Jersey is where the conduct causing injury to the Plaintiffs and Class members occurred and emanated.

123.   The application of New Jersey's laws to the Nationwide Class is also appropriate under New Jersey's choice of law rules because New Jersey has significant contacts to the claims of the Plaintiffs and the proposed Nationwide Class, and New Jersey has a greater interest in applying its laws here than any other interested state.

## CLASS ACTION ALLEGATIONS

124.   Plaintiffs bring this action on their own behalf, and on behalf of a nationwide class pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the nationwide class consists of:

> All persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle (the "Nationwide Class").

125.   In the alternative to the Nationwide Class, and pursuant to FED. R. CIV. P. 23(c)(5), Plaintiffs seek to represent the following state classes only in the event that the Court declines to certify the Nationwide Class above:

> All persons or entities in Massachusetts who are current or former owners and/or lessees of a Class Vehicle (the "Massachusetts Class").

> All persons or entities in Florida who are current or former owners and/or lessees of a Class Vehicle (the "Florida Class").

All persons or entities in Hawaii who are current or former owners and/or lessees of a Class Vehicle (the "Hawaii Class").

All persons or entities in New Jersey who are current or former owners and/or lessees of a Class Vehicle (the "New Jersey Class").

All persons or entities in California who are current or former owners and/or lessees of a Class Vehicle (the "California Class").

126.   Together, the New Jersey Class, Massachusetts Class, Hawaii Class, Florida Class and California Class shall be collectively referred to herein as the "State Sub-Classes."  Excluded from the Class and the State Sub-Classes are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify the Class and State Sub-Class definitions if discovery and/or further investigation reveals that they should be expanded or otherwise modified.

127.   Numerosity:  Upon information and belief, each of the Classes is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe that tens of thousands of Class Vehicles have been sold and leased in the United States of America, and thousands of Class Vehicles have been sold or leased in each of the states that are

the subject of the State Sub-Classes.

128.   <u>Existence and Predominance of Common Questions of Fact and Law</u>:
Common questions or law and fact exist as to all members of the Class.  These
questions predominate over the questions affecting individual Class members.
These common legal and factual questions include, but are not limited to:

    a.   whether the sunroof drainage systems in Class Vehicles are
        predisposed to fail prematurely;

    b.   whether the sunroof drainage systems in Class Vehicles contain a
        design defect;

    c.   whether the defective vehicle design is common to all or some of the
        Class Vehicles;

    d.   if so, whether the Sunroof Drainage Defect causes the sunroof
        drainage system problem in Class Vehicles;

    e.   whether Defendants knowingly failed to disclose the existence and
        cause of the Sunroof Drainage Defect in Class Vehicles;

    f.   whether Defendants' conduct violates the New Jersey Consumer
        Fraud Act and the other statutes asserted herein;

    g.   whether, as a result of Defendants' omissions and/or
        misrepresentations of material facts related to the Sunroof Drainage
        Defect and defective sunroof drainage system design Plaintiffs and

members of the Classes have suffered ascertainable loss of monies

and/or property and/or value;

    h.  whether Plaintiffs and Class members are entitled to monetary

damages and/or other remedies and, if so, the nature of any such

relief.

129.  <u>Typicality</u>:  All of the Plaintiffs' claims are typical of the claims of the

Class since each Plaintiff purchased a class vehicle with a Sunroof Drainage

Defect, defective vehicle design, and defective sunroof drainage system design, as

did each member of the Class.  Furthermore, Plaintiffs and all members of the

Class sustained monetary and economic injuries including, but not limited to,

ascertainable loss arising out of Defendants' wrongful conduct.  Plaintiffs are

advancing the same claims and legal theories on behalf of themselves and all

absent Class members.

130.  <u>Adequacy</u>:  All of the Plaintiffs are adequate representatives because

their interests do not conflict with the interests of the Class that they seek to

represent, they have retained counsel competent and highly experienced in

complex class action litigation, and they intend to prosecute this action vigorously.

The interests of the Class will be fairly and adequately protected by Plaintiffs and

their counsel.

131.  <u>Superiority</u>:  A class action is superior to all other available means of

fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and the database of complaints.

132.   Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## VIOLATIONS ALLEGED

### COUNT I
### VIOLATION OF THE NJCFA
### (On Behalf of the Nationwide Class or,
### Alternatively, the New Jersey Class)

133.  Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

134.  The NJCFA protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J.Stat. Ann. § 56:8-2.

135.  Plaintiffs and members of the Class are consumers who purchased and/or leased Class Vehicles for personal, family or household use.

136.  Defendants also engaged in unlawful conduct in violation of the NJCFA by making knowing and intentional omissions.  Defendants knowingly failed to disclose the design defect in the Class Vehicles in order to secure the sale of these vehicles, and to offer them at a premium price.

137.  Defendants did not fully and truthfully disclose to its customers the true nature of the inherent design defect with the sunroof drainage system, which was not readily discoverable until years later, often after the warranty has expired.

As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said design defects and all of the resultant problems.  These facts that Defendants concealed were solely within their possession.

138.   Defendants intended that Plaintiffs and all Class Members rely on the acts of concealment and omissions, so that they would purchase the Class Vehicles.

139.   Defendants' conduct caused Plaintiffs and Class members to suffer an ascertainable loss.  In addition to direct monetary losses, Plaintiffs and Class members have suffered an ascertainable loss by receiving less than what was promised.

140.   A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiffs and the Class.  Had the defective vehicle design in the Class Vehicles been disclosed, consumers would not have purchased them or would have paid less for the Class Vehicles had they decided to purchase them.

## COUNT II
## BREACH OF EXPRESS WARRANTY
### (On Behalf of the Nationwide Class or,
### Alternatively, each of the State Sub-Classes)

141.   Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

142.   Defendants expressly warranted that the Class Vehicles were of high quality and, at a minimum, would actually work properly.  Defendants also expressly warranted that they would repair and/or replace defects in material and/or workmanship free of charge that occurred during the new vehicle and certified pre-owned ("CPO") warranty periods.

143.   Defendants breached this warranty by selling to Plaintiffs and Class members the Class Vehicles with known sunroof drainage system problems, which are not of high quality, and which fail prematurely and/or fail to function properly.

144.   Defendants further breached this warranty by failing to repair and/or replace Plaintiffs' Hay, Neale and other Class Members' defective sunroof drain systems when the defective systems failed during the new vehicle and CPO warranty periods.

145.   Plaintiffs Hay and Neale both purchased used vehicles that came with Volvo's CPO warranty.  While both plaintiffs' vehicles were still covered by the CPO Warranty, Plaintiffs Hay and Neale sustained damage to their vehicles as a result of water ingress caused by defective sunroof drains and sunroof drain systems.  Pursuant to the terms of the CPO Warranty, Plaintiffs Hay and Neale brought their vehicles to Volvo authorized service centers and requested that such repairs be completed under the CPO Warranty.  Despite these requests, Volvo denied such warranty claims on the basis that the water ingress was caused by an

"outside influence," which Volvo contends was not covered under the CPO Warranty.

146.   Volvo knew of the aforesaid defects at least as early as September 2, 2005 -- as evidenced by the Technical Service Bulletin No. 83-34 issued by Volvo -- and continues to have knowledge of the defect(s) and breaches of its express warranty, yet has intentionally failed to notify Plaintiffs and members of the Plaintiff Class.

147.   This intended failure to disclose known defect(s) is malicious, and was carried out with willful and wanton disregard for the rights and economic interests of Plaintiffs and Class members.

148.   As a result of the Defendants' actions, Plaintiffs and Class members have suffered economic damages including but not limited to costly repairs, loss of vehicle use, substantial loss in value and resale value of the vehicles, and other related damage.

149.   Defendants' breach of this warranty caused damages to Plaintiffs and Class members.

150.   Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.  Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

151.  The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Volvo and Class members, and Volvo knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

152.  Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

**COUNT III**
**BREACH OF THE IMPLIED**
**WARRANTY OF MERCHANTABILITY**
**(On Behalf of the Nationwide Class or,**
**Alternatively, each of the State Sub-Classes)**

153.  Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

154.  Defendant Volvo is a "merchant" as defined under the Uniform Commercial Code ("UCC").

155.  The Class Vehicles are "goods" as defined under the UCC.

156.  Defendants impliedly warranted that the Class Vehicles were of a merchantable quality.

157.  Defendants breached the implied warranty of merchantability, as the Class Vehicles were not of a merchantable quality due to the defective sunroof drainage system, and the associated problems caused by this defect.

158.  As a direct and proximate result of the breach of said warranties, Plaintiffs and Class members were injured, and are entitled to damages.

159.  Defendants' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

160.  The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and member of the Class. Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Volvo and Class members, and Volvo knew or should have known that the Class Vehicles were defective at the time of sale and that the sunroof drainage system would fail well before their useful lives.

161.  Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

**COUNT IV**
**COMMON LAW FRAUD**
**(On Behalf of the Nationwide Class or,**
**Alternatively, the New Jersey Class)**

162.   Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

163.   Defendants made material omissions concerning a presently existing or past fact.  For example, Defendants did not fully and truthfully disclose to its customers the true nature of the inherent design defect with the sunroof drainage system, which was not readily discoverable until years later, often after the warranty has expired.  As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said design defects and all of the resultant problems.

164.   These omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiffs and Class members rely on them.

165.   Plaintiffs and Class members reasonably relied on these omissions, and suffered damages as a result.

**COUNT V**
**BREACH OF THE DUTY OF GOOD FAITH**
**AND FAIR DEALING**
**(On Behalf of the Nationwide Class or,**
**Alternatively, the New Jersey Sub-Class)**

166.   Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

167.   Every contract in New Jersey contains an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

168.   Defendants breached the covenant of good faith and fair dealing by, *inter alia*, failing to notify Plaintiffs and Class members of the sunroof drainage system defect in the Class Vehicles, and failing to fully and properly repair this defect.

169.   Defendants acted in bad faith and/or with a malicious motive to deny Plaintiffs and Class members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

## COUNT VI
### VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION LAW
### (On Behalf of the Massachusetts Sub-Class)

170.   Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

171.   MASS. GEN. LAWS ch. 93A, §1, *et seq.* prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

172.   Defendants have engaged in unfair competition and, unfair, unlawful

or fraudulent business practices by the practices described above, and by

knowingly and intentionally concealing from Plaintiffs and Class members that the

Class vehicles suffer from a design defect (and the costs, risks, and diminished

value of the vehicles as a result of this problem).  Defendants should have

disclosed this information because they were in a superior position to know the

true facts related to this design defect, and Plaintiffs and Class members could not

reasonably be expected to learn or discover the true facts related to this defect.

173.   These unfair methods of competition and unfair and deceptive acts

have caused injuries to Plaintiffs and members of the Class.  Plaintiffs provided

Defendants with a notification pursuant to Massachusetts General Laws c. 93A, §9

prior to filing this Consolidated Amended Complaint.

**COUNT VII**
**VIOLATION OF THE FLORIDA**
**DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(On Behalf of the Florida Sub-Class)**

174.   Plaintiffs and the Classes incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

175.   The purpose of the Florida Deceptive and Unfair Trade Practices Act

("FDUTPA") is "to protect the consuming public and legitimate business

enterprises from those who engage in unfair methods of competition, or

unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or

commerce." FLA. STAT. § 501.202 (2).

176.   Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the practices described above, and by knowingly and intentionally concealing from Plaintiff and Class members the fact that the Class Vehicles suffer from a design defect (and the costs, risks, and diminished value of the vehicles as a result of this problem).  Defendants should have disclosed this information because they were in a superior position to know the true facts related to this design defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to this defect.

177.   These unfair methods of competition and unfair and deceptive acts have caused injuries to Plaintiffs and members of the Class.

**COUNT VIII**
**VIOLATION OF THE HAWAII UNIFORM**
**DECEPTIVE TRADE PRACTICE ACT**
**(On Behalf of the Hawaii Sub-Class)**

178.   Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

179.   The Hawaii Uniform Deceptive Trade Practice Act ("HUDTPA") prohibits, *inter alia:*  causing a "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;" representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;" and engaging "in any other conduct which similarly creates a likelihood of confusion or of

misunderstanding." *See* HAW. REV. STAT. ANN. § 481A-3.

180.   Plaintiff Berg and members of the Class are consumers who purchased and/or leased Class Vehicles for personal, family or household use.

181.   Defendants also engaged in unlawful conduct in violation of the HUDTPA by making knowing and intentional omissions.  Defendants knowingly failed to disclose the design defect in the Class Vehicles in order to secure the sale of these vehicles, and to offer them at a premium price.

182.   Defendants did not fully and truthfully disclose to its customers the true nature of the inherent design defect with the sunroof, which was not readily discoverable until years later, often after the warranty has expired.  As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said design defects and all of the resultant problems.  These facts that Defendants concealed were solely within their possession.

183.   Defendants intended that Plaintiffs and all Class Members rely on the acts of concealment and omissions, so that they would purchase the Class Vehicles.

184.   Defendants' conduct caused Plaintiffs and Class members to suffer an ascertainable loss.  In addition to direct monetary losses, Plaintiffs and Class members have suffered an ascertainable loss by receiving less than what was

promised.

185.   A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiffs and the Class.  Had the defective vehicle design in the Class Vehicles been disclosed, consumers would not have purchased them or would have paid less for the Class Vehicles had they decided to purchase them.

186.   Plaintiffs seek damages to the fullest extent permissible under the HUDTPA.

**COUNT IX**
**VIOLATION OF THE CALIFORNIA BUSINESS**
**AND PROFESSIONS CODE § 17200**
**(On Behalf of the California Sub-Class)**

187.   Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

188.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

189.   Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and Class members the Class vehicles suffer from a design defect (and the costs, risks, and diminished value of the vehicles as a result of this problem).  Defendants

should have disclosed this information because they were in a superior position to know the true facts related to this design defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to this defect.

190.   These acts and practices have deceived Plaintiffs and are likely to deceive the public.  In failing to disclose the design defect and suppressing other material facts from Plaintiffs and Class members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and Class members.  The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs and Class members, as it would have been to all reasonable consumers.

191.   The injuries suffered by Plaintiffs and Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition. Nor are they injuries that Plaintiffs and Class members should have reasonably avoided.

192.   Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710 and 1750 *et seq.*, and California Commercial Code § 2313.

193.   Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and

revenues generated as a result of such practices, and all other relief allowed under

CAL. BUS. & PROF. CODE § 17200.

**COUNT X**
**VIOLATION OF THE CALIFORNIA CONSUMERS**
**LEGAL REMEDIES ACT, CALIFORNIA CIVIL**
**CODE § 1750, *ET SEQ.***
**(On Behalf of the California Sub-Class)**

194.   Plaintiffs incorporate by reference the allegations of all foregoing

Paragraphs as if such had been set forth in full herein.

195.   California's Consumer Legal Remedies Act ("CLRA") prohibits

unfair methods of competition and unfair or deceptive acts or practices undertaken

by any person in a transaction intended to result or which results in the sale or

lease of goods or services to any consumer."  CAL. CIV. CODE § 1770.

196.   Defendants are "persons" as defined by Civil Code section 1761(c).

197.   Plaintiff and California Sub-Class Members are consumers who

purchased or leased the Class Vehicles.

198.   Defendants engaged in unfair and deceptive acts in violation of the

CLRA by the practices described above, and by knowingly and intentionally

concealing from Plaintiffs and Class members the Class vehicles suffer from a

design defect (and the costs, risks, and diminished value of the vehicles as a result

of this problem).   These acts and practices violate, at a minimum, the following

sections of the CLRA:

(a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

(a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9) Advertising goods and services with the intent not to sell them as advertised.

199.   Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

200.   Defendants knew that their Class Vehicles and their Sunroof Drainage Systems were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

201.   Defendants were under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles and their Sunroof Drainage Systems because:

a.   Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles and their Sunroof Drainage Systems;

b. Plaintiff and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their Sunroof Drainage Systems had a dangerous safety defect until manifestation of the defect; and

c. Defendants knew that Plaintiff and the Class Members could not reasonably have been expected to learn or discover the safety defect and the associated repair costs that it causes until manifestation of the defect.

202.  In failing to disclose the Sunroof Drainage Defect and the associated repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

203.  The facts concealed or not disclosed by Defendants to Plaintiff and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price.  Had Plaintiffs and the Class known about the defective nature of the Class Vehicles and their Sunroof Drainage Systems, they would not have purchased the Class Vehicles or would have paid less for them.

204.  As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer actual damages.

205.   Defendants have agreed to waive Plaintiff Taft's and Plaintiff Kruger's pre-suit notice requirement relating to Defendants' alleged violations of the CLRA pursuant to California Civil Code § 1782(a).

206.   Plaintiffs seek all relief available under the CLRA.

**COUNT XI**
**THE SONG-BEVERLY ACT - BREACH OF EXPRESS WARRANTY**
**VIOLATIONS OF CIVIL CODE § 1790 *ET SEQ*.**
**(On Behalf of the California Sub-Class)**

207.   Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

208.   Plaintiffs Taft and Kruger assert this cause of action on behalf of themselves and the California Sub-Class.

209.   As an express warrantor and manufacturer, Volvo had certain obligations under the Song-Beverly Act, and, in particular, Civil Code §1793.2(b) and (d), to conform the Class Vehicles to the express warranty.

210.   Volvo has been unable to conform the vehicles to the express warranty after a reasonable number of attempts at repair.  Defendants are, therefore, required to either pay damages or reimburse the buyer the purchase price and incidental damages pursuant to Civil Code §§ 1793.2(d) and 1794.

211.   Defendants knew of its obligations under its warranty to pay for a new Vehicle, as needed, caused by the defect described herein.  However, Volvo has

willfully refused to pay for a new vehicle as required under the warranty.  Volvo is,

therefore, liable for not only damages, but also a civil penalty pursuant to Civil

Code § 1794.

## COUNT XII
### FAILURE TO FULLY SET FORTH TERMS OF WARRANTY IN WRITING PURSUANT TO SONG-BEVERLY CONSUMER WARRANTY ACT, CALIFORNIA CIVIL CODE § 1790 *ET SEQ.*
### (On Behalf of the California Sub-Class)

212.  Plaintiffs incorporate by reference the allegations of all foregoing

Paragraphs as if such had been set forth in full herein.

213.  The Song-Beverly Consumer Warranty Act, California Civil Code

sections 1790 *et seq.*, requires, at section 1793.1, that a retailer who makes an

express warranty fully set forth the terms of the warranty in writing.

214.  Defendants failed to specify in writing, among other things, the

requirement of periodic maintenance of the Class Vehicles' Sunroof Drainage

System, as well as its failure to inform consumers that it has a general policy of

not-covering water leaks due to clogging of any drains under warranty.

215.  As a result of Defendants' violations of the Song-Beverly Consumer

Warranty Act, Plaintiff and Class Members are entitled, pursuant to California

Civil Code section 1794, to damages and other legal and equitable relief.

**COUNT XIII**

**BREACH OF IMPLIED WARRANTY PURSUANT TO
SONG-BEVERLY CONSUMER WARRANTY ACT, CALIFORNIA CIVIL
CODE §§ 1790 *ET SEQ.*, 1792 AND 1791.1 *ET. SEQ.*
(On Behalf of the California Sub-Class)**

216.  Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

217.  Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.  Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

218.  Defendants provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their Sunroof Drainage Systems are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles and their Sunroof Drainage Systems are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their Sunroof Drainage Systems are defective due to the Sunroof Drain Defect and the resulting damage and safety-related hazards that it can cause.

219.  Plaintiffs relied on implied warranties of merchantability made by Defendants concerning the Class Vehicles and sustained substantial damages resulting from the breach of those warranties by the Defendants.

220.  Plaintiffs and Class Members purchased the Class Vehicles within the State of California.  Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use at the time of sale.  This implied warranty included, among other things: (a) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Defendants were safe for providing safe and reliable transportation; and (b) a warranty that the Class Vehicles would be fit for their intended use and would not experience water ingress into the interior as a result of the Sunroof Drainage Defect when they are driven within their range of operation and during foreseeable and normal usage.

221.  Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the Class Members with durable and safe transportation during normal and/or foreseeable usage.  Instead, the Class Vehicles are defective.  These defects include, but are not limited to, the Sunroof Drainage Defect.

222.  Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code sections 1792 and 1791.1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully requests that this Court:

A.      determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B.      appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C.      award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.      award pre-judgment and post-judgment interest on such monetary relief;

E.      grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with

appropriate curative notice regarding the existence and cause of the design defect;

F.      award reasonable attorney's fees and costs; and

G.      grant such further relief that this Court deems appropriate.


Dated:  May 21, 2012

                    Respectfully submitted,

          By:     *//s// Joseph G. Sauder*
                    Joseph G. Sauder
                    Matthew D. Schelkopf
                    Benjamin F. Johns
                    CHIMICLES & TIKELLIS LLP
                    One Haverford Centre
                    361 West Lancaster Avenue
                    Haverford, PA 19041
                    Telephone: (610) 642-8500
                    Facsimile: (610) 649-3633
                    E-mail: JGS@chimicles.com
                    MDS@chimicles.com
                    BFJ@chimicles.com

                    David A. Mazie
                    Matthew R. Mendelsohn
                    MAZIE SLATER KATZ & FREEMAN, LLC
                    103 Eisenhower Parkway
                    Roseland, New Jersey 07068
                    Telephone:  (973) 228-9898
                    dmazie@mskf.net
                    mmendelsohn@mskf.net

                    ***Co-lead Attorneys for***
                    ***Plaintiffs and the Proposed Class***

Bruce D. Greenberg
LITE DEPALMA GREENBERG, LLC
Two Gateway Center
Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Email: mailto: bgreenberg@litedepalma.com

Richard Norman
R. Martin Weber, Jr.
CROWLEY NORMAN LLP
3 Riverway, Suite 1775
Houston, Texas  77056
Telephone:  (713) 651-1771
rnorman@crowleynorman.com
mweber@crowleynorman.com

Thomas K. Brown
Justin Presnal
FISHER, BOYD, BROWN, &
HUGUENARD, L.L.P.
2777 Allen Parkway, 14th Floor
Houston, Texas  77019
Telephone:  (713) 400-4000
TomB@fisherboyd.com
JustinP@fisherboyd.com

James C. Shah
SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP
475 White Horse Pike
Collingswood, NJ  08107-1909
Telephone:  (856) 858-1770
Facsimile: (856) 858-7012
Email: jshah@sfmslaw.com

Michael A. Caddell
Cory S. Fein
CADDELL & CHAPMAN
1331 Lamar, #1070

Houston TX  77010
713.751.0400 (phone)
713.751.0906 (fax)
Email: MAC@caddellchapman.com

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew D. Schelkopf, certify that on this 21st day of May, 2012, I caused the foregoing Plaintiffs' Second Amended Complaint to be filed using the Court's CM/ECF system, thereby causing it to be served upon all registered ECF users in this case.

*/s/ Matthew D. Schelkopf*
Matthew D. Schelkopf
