# EXHIBIT A

WALTER BRATIC - September 5, 2012
Page 19 Line 17 - Page 29 Line 5 & Page 45 Line 6 - Page 49 Line 14 Are Confidential Attorneys' Eyes Only

Page 1

1             IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
2                     NEWARK DIVISION
3    JOANNE NEALE, ET AL.,              )
                Plaintiffs              )
4                                       )
     vs.                                )         CASE NO.
5                                       )  2:10-cv-04407-DMC-MF
     VOLVO CARS OF NORTH AMERICA,       )
6    LLC, ET AL.,                       )
                Defendants              )
7

8           CONFIDENTIAL - ATTORNEYS' EYES ONLY
9              PAGE 19 LINE 17 - PAGE 29 LINE 5
10             PAGE 45 LINE 6 - PAGE 49 LINE 14
11             ORAL VIDEOTAPED DEPOSITION
12                   WALTER BRATIC
13                  September 5, 2012
14

15        ORAL VIDEOTAPED DEPOSITION OF WALTER BRATIC,
16   produced as a witness at the instance of the Defendants
17   and duly sworn, was taken in the above-styled and
18   numbered cause on the 5th day of September, 2012, from
19   9:39 a.m. to 3:55 p.m., before Kelly Hanna, Certified
20   Shorthand Reporter in and for the State of Texas,
21   reported by computerized stenotype machine at the
22   offices of Crowley Norman LLP, Three Riverway, Suite
23   1775, Houston, Texas, pursuant to the Federal Rules of
24   Civil Procedure and the provisions stated on the record
25   or attached hereto.

WALTER BRATIC - September 5, 2012
Page 19 Line 17 - Page 29 Line 5 & Page 45 Line 6 - Page 49 Line 14 Are Confidential Attorneys' Eyes Only

Page 4

1          THE VIDEOGRAPHER:  Today is September 5,

2    2012.  We're on the record at 9:09 -- 9:39.

3                    WALTER BRATIC,

4    having been first duly sworn, testified as follows:

5                    EXAMINATION

6        Q.   (BY MR. HERZOG) State your full name for the

7    record, sir.

8        A.   Yes.  My name is Walter Bratic.

9        Q.   And where are you employed, Mr. Bratic?

10       A.   I'm employed at a company called OverMont

11   Consulting.

12       Q.   What is OverMont Consulting?

13       A.   It's a financial, accounting, statistical and

14   economic consultancy.

15       Q.   Who owns OverMont Consulting?

16       A.   OverMont Consulting is owned by two

17   shareholders.

18       Q.   Who are the shareholders?

19       A.   Myself and Carmen Eggleston.

20       Q.   When was OverMont Consulting formed?

21       A.   It was formed, to the best of my recollection,

22   August of 2008.

23       Q.   And can you generally describe for me what

24   percentage of the business OverMont Consulting is

25   consulting or testifying in connection with lawsuits?

Page 10

1    come work for Ernst & Whinney here in Houston, to do

2    consulting work for them.

3         Q.   All right.  And what -- what part of Ernst &

4    Whinney did you -- did you go to work for?  Were you on

5    the audit side or were you on the consulting side?

6         A.   I was on the consulting side; however, I began

7    doing my work in the audit division.

8         Q.   And you're a Certified Public Accountant; is

9    that correct, sir?

10        A.   I am.

11        Q.   You became certified in 1981?

12        A.   That's correct.

13        Q.   When did you first take the exam?

14        A.   I believe in 1980.

15        Q.   And did you pass it on the first time?

16        A.   I passed the parts I was qualified for the

17   first time.

18        Q.   Okay.  And what parts were you not qualified

19   for?

20        A.   I hadn't gotten, I don't think, the hours

21   yet -- my transcript hadn't come through -- to

22   qualify -- I can't remember, because it was five parts

23   back then, I think.  I think the one part I wasn't

24   qualified to sit for was audit.

25        Q.   And, so, how many parts did you take when you

WALTER BRATIC - September 5, 2012
Page 19 Line 17 - Page 29 Line 5 & Page 45 Line 6 - Page 49 Line 14 Are Confidential Attorneys' Eyes Only

Page 51

1    A.    I don't know if the company still exists.   It

2  was acquired by Charles River Associates.

3    Q.    Okay.  All right.  Let's -- let's turn to the

4  next page.

5              You were a partner at

6  PriceWaterhouseCoopers, correct, from 1998 to 1999?

7    A.    From 1998 to 1999, I was a partner at

8  PriceWaterhouseCoopers.

9    Q.    Okay.  And it says you were the Global

10 Director/Partner, Intellectual Property Services, for

11 the Financial Advisory Services Practice; is that

12 correct?

13   A.    That's correct.

14   Q.    And was that here in the Houston office?

15   A.    No -- well, I was based in Houston; but my

16 responsibilities were worldwide.

17   Q.    Okay.  And from 1983 to 1998, you were employed

18 by PriceWaterhouse, correct?

19   A.    That's correct.

20   Q.    And was -- is it fair to say, Mr. Bratic, that

21 the majority of -- that -- strike that.

22              Is it fair to say, Mr. Bratic, that an

23 area of primary expertise that you have is in

24 intellectual property?

25   A.    Yes.

WALTER BRATIC - September 5, 2012
Page 19 Line 17 - Page 29 Line 5 & Page 45 Line 6 - Page 49 Line 14 Are Confidential Attorneys' Eyes Only

Page 64

1   consumers that the class vehicles are predisposed to a

2   sunroof drainage system defect, collectively, the

3   sunroof drainage defect, which leads to the accumulation

4   of dirt, debris and other naturally occurring particles

5   within the sunroof water drainage system as well as the

6   kinking of tubing within the drainage system."

7           Did I read that correctly?

8       A.   You did.

9       Q.   And is it your understanding that that's the

10  wrongful conduct that Volvo is alleged to have committed

11  in this case?

12      A.   I would say, aside from what's in the pleading

13  regarding the -- the alleged -- the allegations I just

14  read to you in Paragraph 13, from a product perspective,

15  that's my understanding.

16      Q.   Okay.  So, your understanding is that the

17  action arises from Volvo's failure to disclose to the

18  plaintiffs and the consumers that the class vehicles are

19  predisposed to a sunroof drainage system defect,

20  correct?

21      A.   Correct.  Generally.

22      Q.   Okay.  Have you told me all the work you have

23  done for Ford, to the best of your recollection?

24      A.   I believe you were discussing it, and then you

25  moved on to another subject matter.

Page 92

1   Authority in a matter against Entergy involving the

2   chilled air system.

3        Q.   Okay.  You were representing Fox?

4        A.   Yes, I was representing Fox.

5        Q.   And who hired you?

6        A.   Jackson Walker.

7        Q.   Okay.

8        A.   The law firm of Jackson Walker.

9             MR. HERZOG:  Why don't we take a break so

10  the videographer can change the tape.

11            THE WITNESS:  That's a great idea.

12            THE VIDEOGRAPHER:  Okay.  Off the record

13  at 11:42.

14            (Recess taken from 11:42 to 11:53.)

15            THE VIDEOGRAPHER:  Okay.  Back on the

16  record at 11:53.  This is the beginning of Tape 2.

17       Q.   (BY MR. HERZOG) Mr. Bratic, do you have any

18  training, education or experience in automotive design

19  or manufacture?

20       A.   No.

21       Q.   Do you have any training, education or

22  experience in product warnings?

23       A.   Product warnings?

24       Q.   Yes, sir.

25       A.   No.

Page 94

1   tracking studies?

2        A.   I don't know -- I'm not sure what you mean by

3   that term -- I mean, what you mean by that question.

4        Q.   Okay.  Do you know what a tracking study is?

5        A.   Well, as I understand, the term "tracking

6   studies" has to do with tracking or analyzing frequency

7   of occurrences of certain events.

8        Q.   And do you consider yourself an expert in that

9   area?

10        A.   I consider myself to have a lot of experience

11   in having done extensive analysis regarding frequency

12   and occurrence of certain types of events -- recurrence

13   of events.  That's how I would answer that question.

14        Q.   Do you consider yourself an expert in consumer

15   behavior?

16        A.   No.

17        Q.   Do you consider yourself an expert in

18   information diffusion?

19        A.   No.

20        Q.   Do you consider yourself an expert in

21   engineering?

22        A.   No.

23        Q.   Have you ever owned or leased a Volvo vehicle?

24        A.   I have owned a Volvo vehicle.

25        Q.   Okay.  What kind of Volvo did you own?

Page 108

1   components -- with automotive components that are --

2   someone has to design the components.  They have a

3   specific characteristic.  They have, you know, depth.

4   They have three dimensions.  So, they have some kind of

5   design feature.

6       Q.   Let's get at it this way, if we can.  You're

7   not an expert in the design of automobiles, are you,

8   sir?

9       A.   No, I'm not.

10      Q.   And you're not an expert in the design of

11  sunroof drainage systems, are you?

12      A.   That's correct.

13      Q.   Have you ever before researched or studied a

14  sunroof drainage system?

15      A.   No.

16      Q.   And you've not conducted your own research or

17  analysis on the sunroof drainage system that's at issue

18  in this case, correct?

19      A.   I'm sorry.  Would you repeat that?

20      Q.   Sure.  You have not conducted your own research

21  or analysis on the sunroof drainage system that's at

22  issue in this case.

23      A.   I'm not sure what you mean by you have not done

24  your own analysis.  You mean regarding the liability

25  issues in this case?

Page 109

1    Q.   The design.

2    A.   Oh, no, of course not.

3    Q.   Okay.  And --

4    A.   I've relied on Dr. Benedict.

5    Q.   Your -- strike that.

6              Your basis for -- or strike that.

7              You have assumed that there is a sunroof

8    drainage system defect based on the report of

9    Mr. Benedict in this case, correct?

10   A.   Dr. Benedict, yes.

11   Q.   Dr. Benedict in this case.

12   A.   That is correct.

13   Q.   All right.  And have you done anything to

14   independently verify or corroborate Dr. Benedict's

15   report in this case?

16   A.   No.

17   Q.   And you have not talked with him about the

18   report?

19   A.   I have not talked to him about the report.

20   Q.   Did you have any questions with respect to the

21   report when you read it?

22   A.   No.

23   Q.   When did you first receive a copy of the

24   report?

25   A.   I would have received a copy of the report, I

WALTER BRATIC - September 5, 2012
Page 19 Line 17 - Page 29 Line 5 & Page 45 Line 6 - Page 49 Line 14 Are Confidential Attorneys' Eyes Only

Page 125

1      A.    That's -- that's -- it's no less than that at

2    this time.

3      Q.    Right.  And, Mr. Bratic, if I understand your

4    report correctly, that 42.8 million represents the cost

5    of modifying the sunroof drainage system in the way

6    recommended by Dr. Benedict, correct?

7      A.    Correct.

8      Q.    All right.  And, so, in your report, that

9    number is to be used to modify the system, correct?

10     A.    It reflects the value -- the cost associated

11   with repairing all those vehicles --

12     Q.    Okay.

13     A.    -- according to the methodology set forth in

14   Dr. Benedict's certification.

15     Q.    Okay.  And in --

16     A.    And with the -- I'm sorry, but just -- with the

17   ongoing acknowledgment that I've mentioned to you

18   already that there may be some modifications to the

19   analysis based on the warranty database -- warranty

20   spreadsheets that we talked about, but that shouldn't

21   impact this number..

22               THE WITNESS:  Bless you.

23     Q.    (BY MR. HERZOG) And if I understand

24   correctly --

25     A.    Yes.

1    Q.    -- you have eliminated from the estimate of

2    total damages vehicles that are scrapped or no longer in

3    service.

4    A.    I made an effort to account for that.

5    Q.    All right.  And you -- you made an effort to

6    account for that by using data available on the -- on

7    the percentage of vehicles still in service as

8    reported -- is it NHTSA that reported that?

9    A.    Yeah, by the federal government.

10   Q.    By the NHTSA?

11   A.    That's correct.

12   Q.    All right.  And why did you eliminate those

13   vehicles?

14   A.    What -- a certain portion of vehicles?

15   Q.    Yes, sir.

16   A.    Well, because I wanted to be fair and

17   conservative in my calculation, and I wanted to account

18   for the fact that not all vehicles that were sold going

19   all the way back to 2004, for example, are necessarily

20   in service.  Some may have been damaged through, you

21   know, totaled as a result of accidents or things of that

22   nature.  And, so, it would be improper to include all

23   vehicles.

24                  Now, as my report pointed out, Volvo has

25   not produced any statistics on Volvo's records on, you

Walter Bratic 9/5/2012

CONFIDENTIAL ATTORNEYS' ONLY PAGE 19 LINE 17 - PAGE 29 LINE 5 AND PAGE 45 LINE 6 - PAGE 49 LINE 14

1  know, Volvo's estimates or analysis of vehicles still in

2  service, so I've used the best available information

3  available from other sources.

4      Q.   And, in your opinion, it would be improper to

5  include vehicles not in service?

6      A.   That's true.

7      Q.   And why, in your opinion, would it be improper

8  to include vehicles not in service?

9      A.   Well, because if a vehicle was scrapped, for

10  example, was totaled in an accident or so forth, then

11  that vehicle is not being driven around anymore and it

12  wouldn't be exposed or subject to the sunroof drainage

13  defect.

14      Q.   And wouldn't have the risk of a sunroof

15  drainage defect?

16      A.   Correct.

17      Q.   If you would, sir, look at Footnote 24 on

18  Page 6 of 15.  Do you have that in front of you?

19      A.   I'm going to get it.

20      Q.   Sure.

21      A.   Okay.  I'm on Page 6.

22      Q.   Okay.  Footnote 24?

23      A.   Yes.

24      Q.   Do you have that in front of you?

25              And that footnote states "Counsel has

Page 130

1   warranty repair -- warranty work -- to do the -- to

2   correct the drainage -- sunroof drainage defect as set

3   forth by Dr. Benedict.

4        Q.   Okay.  He's a former owner?

5        A.   Yes.

6        Q.   Okay.  Now, he sells it -- the fellow that he

7   sells it to, okay, and this owner owns it.

8        A.   Correct.

9        Q.   At -- at the -- and he still has not

10  experienced any -- any problem with the sunroof drainage

11  system.  Has he suffered damages?

12       A.   Well, let me put it -- let me answer it this

13  way.

14              MR. WEBER:  I'm -- same objection I made

15  before.

16       A.   Each vehicle has suffered at least the damages

17  associated with the required drainage defect.  So, I'm

18  not saying there's -- there's no duplication of -- of

19  damage claim here.  For example, either the former owner

20  or the current owner, but that vehicle.

21       Q.   (BY MR. HERZOG) That's -- that's what I'm

22  trying to get at.

23       A.   Yeah.  There's no duplication.

24       Q.   Okay.  Either the former owner --

25       A.   Or the current.  That's why --

Walter Bratic 9/5/2012

1    Q.    -- or the -- or the current owner is -- is

2    entitled to it, to -- to the repair.  The vehicle is

3    entitled to the repair --

4    A.    Right.

5    Q.    -- in your opinion?

6    A.    Correct.  And that's why you see, when we

7    discussed this before the lunch break, the word "or" was

8    used.

9    Q.    Right.

10   A.    But it also is "and" in --

11   Q.    Right.

12   A.    -- in that context.

13   Q.    Right.

14   A.    But only once.  Each vehicle would only be

15   subject to the prescribed repairs, according to

16   Dr. Benedict's analysis.

17   Q.    Okay.  And -- and, so, is it -- is it fair to

18   say, then, Mr. Bratic, that for the -- the vehicles

19   where there is a current owner --

20   A.    Yes.

21   Q.    -- and they're still in use --

22   A.    Yes.

23   Q.    -- that the former owner didn't suffer any

24   damages?

25                MR. WEBER:  Objection, form.  Calls for --

Hanna & Hanna, Inc.

Walter Bratic 9/5/2012

CONFIDENTIAL ATTORNEYS' ONLY PAGE 19 LINE 17 - PAGE 29 LINE 5 AND PAGE 45 LINE 6 - PAGE 49 LINE 14

1    Q.    (BY MR. HERZOG) The current owner is the one

2   who suffers the damages, and they're the ones that need

3   to get the vehicle repaired, right?

4                MR. WEBER:  Objection, form.  Calls for a

5   legal conclusion.  Outside the scope of the report.

6    A.    I do not know in your hypothetical whether the

7   former owner would still be entitled to damages.  What I

8   do know is, based on my analysis, that the current owner

9   of a vehicle would be entitled to --

10   Q.    (BY MR. HERZOG) The cost of repair?

11   A.    -- the cost of correcting the defect per

12  Dr. Benedict.

13   Q.    Okay.  Now, assume that -- just -- just so

14  we're clear, okay, you've got a current owner and you've

15  got former owners and where the vehicle is still in

16  service, your opinion is that the current owner is

17  entitled to -- assuming that the vehicle has not had any

18  modifications to the sunroof drainage system -- then the

19  current owner is the one who is entitled to the cost of

20  modifying the sunroof drainage system, according to

21  Dr. Benedict?

22                MR. WEBER:  Objection, form.  Outside the

23  scope of the report.

24                THE WITNESS:  Would you read that back,

25  please.

Walter Bratic 9/5/2012
CONFIDENTIAL ATTORNEYS' ONLY PAGE 19 LINE 17 - PAGE 29 LINE 5 AND PAGE 45 LINE 6 - PAGE 49 LINE 14

```
 1              (The record was read as requested.)

 2     A.    I haven't made a determination if it's the

 3   current owner or the former owner.  It's just at least

 4   either/or is entitled to the -- the cost associated with

 5   the correction of the defect.

 6     Q.    (BY MR. HERZOG) Okay.  And the -- the damages

 7   that you've described as the cost associated with

 8   remedying the defect as described by Dr. Benedict are

 9   for the purposes of eliminating the risk of a clogged

10   sunroof drain and resulting leak inside the vehicle,

11   correct?

12     A.    Well, I'm not serving as a technical expert in

13   this case.  So, I don't really want to talk about the

14   word "risk."  All I'm -- all I understand is it's my

15   understanding that there is a defect in certain model

16   vehicles as described in the table on Page 4 of my

17   report, and it's my understanding that according to

18   Dr. Benedict, all vehicles still in service would

19   require the corrective procedures that he set forth in

20   his --

21     Q.    Okay.

22     A.    -- certification --

23     Q.    Okay.

24     A.    -- in order to eliminate that sunroof drainage

25   defect.
```

Hanna & Hanna, Inc.

Walter Bratic 9/5/2012

1    Q.    Okay.  Got it.  So, let's see if we can make

2    sure the record is clear.

3              Your opinion is that the 42.8 million in

4    damages is necessary to eliminate the defect in the

5    vehicles as claimed by Dr. Benedict, correct?

6              THE WITNESS:  Would you read that back,

7    please.

8              (The record was read as requested.)

9    A.    Yes.

10   Q.    (BY MR. HERZOG) All right.  And, so, in the

11   circumstance where you have a former owner --

12   A.    Yes.

13   Q.    -- who has driven the vehicle, but who has not

14   suffered any consequences of the alleged defect, okay,

15   he hasn't had a clogged sunroof drain, hasn't had any

16   water in the vehicle, and now sells that vehicle and

17   you've got a current owner.  The current owner is the

18   owner that is now driving the vehicle that Dr. Benedict

19   says is defective, right?

20             MR. WEBER:  Objection, form.  Calls for a

21   legal conclusion.  Outside the scope of his report.

22   A.    I do not have his complete report in front of

23   me but -- let me look here -- but so far as I recall

24   from at least the sections I have cited here, he doesn't

25   make a distinction between current and former owners.

Hanna & Hanna, Inc.

Walter Bratic 9/5/2012

1          MR. HERZOG:  Stop it.  Make your objection

2     to form or we're going to get the magistrate on the

3     phone.

4          MR. WEBER:  In -- in that case, I'm

5     instructing the witness not to answer because it's

6     outside the scope of his report.  He didn't opine on it.

7     You're entitled to take his opinions based on what he's

8     opined on.

9          MR. HERZOG:  Let's go off the record.

10          THE VIDEOGRAPHER:  Off the record at 2:12.

11          (Recess taken from 2:12 to 2:14.)

12          THE VIDEOGRAPHER:  Okay.  Back on record

13     at 2:14.

14     Q.   (BY MR. HERZOG) Are you offering any opinion in

15     this case, Mr. Bratic, that class members have suffered

16     any damages other than those identified in your report?

17     And I'm not talking about the quantification of it --

18     A.   Right.

19     Q.   -- because I know you may need to make some

20     further modifications to the quantification, but I'm

21     talking about the types of damages.

22     A.   Well, I talk about two types of damages --

23     Q.   Correct.

24     A.   -- that have been sustained.

25     Q.   Right.  And are you offering any opinion that

Walter Bratic 9/5/2012

CONFIDENTIAL ATTORNEYS' ONLY PAGE 19 LINE 17 - PAGE 29 LINE 5 AND PAGE 45 LINE 6 - PAGE 49 LINE 14

 1   class members have suffered any type of damages other

 2   than the two types that you have identified in your

 3   report?

 4       A.   No, I am not.

 5               Do you want to make it clear for the

 6   record what the two types of damages are?

 7       Q.   I'm going to.

 8       A.   Oh, okay.

 9       Q.   We're going to get to that.

10       A.   All right.  Fine.

11       Q.   I just wanted to make --

12       A.   That's fine.

13       Q.   I thought I could get at it that way.

14       A.   That's fine.

15       Q.   Returning, if we could, to Paragraph 14 --

16       A.   Paragraph 14.

17       Q.   -- of Exhibit D-1.

18       A.   All right.

19       Q.   The sentence at the bottom of the page, on

20   Page 6, that begins "Second."

21       A.   Yes.

22       Q.   "Second, members of the Nationwide Class who

23   have experienced sunroof drainage failure" --

24       A.   Right.

25       Q.   -- "which was not treated as a warranty claim,

Walter Bratic 9/5/2012
CONFIDENTIAL ATTORNEYS' ONLY PAGE 19 LINE 17 - PAGE 29 LINE 5 AND PAGE 45 LINE 6 - PAGE 49 LINE 14

1   A.    From an economic or financial perspective, the

2   term "aggregate damages" would mean to me the sum total

3   of damages sustained from a given event or -- or

4   incident.

5   Q.    (BY MR. HERZOG) Have you ever heard the term

6   "aggregate damages" in connection with a lawsuit or a

7   class action lawsuit that you've been involved in?

8   A.    Yes.

9   Q.    Okay.  In what context?

10  A.    In the context of what the total cost --

11  Q.    Okay.

12  A.    -- to make the class whole.

13  Q.    And -- and without calculating damages as to

14  any particular individual class member, correct?

15  A.    Yes.

16  Q.    All right.  And is it fair to say that the

17  calculation that you're using regarding the loss

18  allegedly sustained by nationwide class members is

19  expressed in terms of aggregate damages?

20  A.    It is.

21          THE WITNESS:  I'd like to take a break

22  sometime soon.

23          MR. HERZOG:  Go ahead.  We can take it

24  now.

25          THE WITNESS:  Just cause -- it would make

Walter Bratic 9/5/2012

CONFIDENTIAL ATTORNEYS' ONLY PAGE 19 LINE 17 - PAGE 29 LINE 5 AND PAGE 45 LINE 6 - PAGE 49 LINE 14

```
 1    it go easier the next time.

 2                MR. HERZOG:  Sure.

 3                THE VIDEOGRAPHER:  Okay.  Off the record

 4    at 2:40.

 5                (Recess taken from 2:40 to 2:45.)

 6                THE VIDEOGRAPHER:  Okay.  Back on the

 7    record at 2:45.  This is the beginning of Tape 3.

 8        Q.   (BY MR. HERZOG) Mr. Bratic, going back to our

 9    discussion earlier about a world in which disclosure of

10    the alleged sunroof drainage defect had been made,

11    you're not prepared to offer an opinion, are you, sir,

12    as to how class members would have reacted had they

13    known the allegedly concealed information?

14        A.   I have not been asked to perform an analysis of

15    that.

16        Q.   So, you don't know and you're not prepared to

17    offer an opinion today, are you, sir, that class members

18    would have made a different purchase or lease decision

19    if the information had been disclosed?

20        A.   No, I'm not prepared to offer any opinion on

21    that subject matter today.

22        Q.   Are you offering an opinion, sir, with respect

23    to the damages suffered by class members if the

24    information had been disclosed?

25        A.   Yes, that's the analysis I have performed.
```

Hanna & Hanna, Inc.

WALTER BRATIC - September 5, 2012
Page 19 Line 17 - Page 29 Line 5 & Page 45 Line 6 - Page 49 Line 14 Are Confidential Attorneys' Eyes Only

Page 156

1    A.    If -- in your hypothetical, if a class member

2  was only informed of the defect and that's it, then

3  they've suffered diminishment in the value of their

4  vehicle, for the fact there's a known defect in the

5  value of their vehicle.  It shouldn't be there.

6    Q.    (BY MR. HERZOG) All right.  And have you done

7  any analysis to determine what that diminished value

8  would be?

9    A.    No.

10    Q.    The second type of damage described in your

11  report -- and we've touched on it briefly -- is that

12  nationwide class members who have experienced a sunroof

13  drainage failure not treated as a warranty claim have

14  incurred out-of-pocket costs associated with the repairs

15  performed on their vehicles, correct?

16    A.    Yes.

17    Q.    All right.  And the damages that such -- such

18  class members suffered would be the out-of-pocket costs

19  that they incurred in repairing their vehicles, correct?

20    A.    Yes.  Just to make sure we're clear, you're

21  talking about the members of the class who either were

22  denied warranty coverage or who had the defect repaired

23  after the warranty period expired, their damages would

24  be measured by the out-of-pocket costs incurred.

25    Q.    Okay.  And, so, you're giving the opinion that

Page 170

1    Q.    Right.

2    A.    And he was told yes.

3    Q.    Right.

4    A.    All right.  Well, he still would have suffered

5    damages because in your hypothetical he wasn't told

6    there was a defect.

7    Q.    Okay.

8    A.    Even though they have the same parts, he wasn't

9    told whether or not there was a defect or not, even

10   though the same parts existed.

11   Q.    Let's -- okay.  So, let's modify.  Same

12   hypothetical and he says "Does this XC90 have the same

13   possibility of a clogged drain -- sunroof drain,

14   resulting in water ingress into the vehicle as did my

15   S60?"  Okay?

16   A.    Yes.

17   Q.    The Volvo dealer says, yeah, it's got the same

18   drain.

19   A.    Well, yes, meaning yes, it has the same defect?

20   Q.    Yeah.

21   A.    All right.

22   Q.    Yeah.  Tells him -- tells him yeah.  Has the

23   same problem.  Now, you call it a defect.  I call it an

24   alleged defect or a problem.

25   A.    No.  Right.

Page 171

1    Q.    But we're talking about the same thing, right?

2    A.    Well, we're assuming that there's a defect --

3    Q.    Right.

4    A.    -- for the purpose of my analysis.

5    Q.    Right.  Right.

6    A.    Okay.

7    Q.    So --

8    A.    Now, there's two answers to that.

9          MR. WEBER:  Hang on.  Are you done with

10   your question?

11         MR. HERZOG:  Yeah.

12         MR. WEBER:  Calls for a legal conclusion.

13   Incomplete hypothetical.  Outside the scope of the

14   report.

15   A.    Two things.  One, I don't know if, from a legal

16   perspective, that particular purchaser has waived any

17   rights he had with respect to making a claim for a

18   defective vehicle because he was on notice about the

19   defect but went ahead and bought the vehicle; but from

20   an economic standpoint, he certainly has incurred damage

21   with respect to he's got a vehicle with a defect,

22   that that defect needs to be cured.

23   Q.    (BY MR. HERZOG) Okay.  You're an expert in

24   statistics, right?

25   A.    I use statistics in my work -- have been --

WALTER BRATIC - September 5, 2012
Page 19 Line 17 - Page 29 Line 5 & Page 45 Line 6 - Page 49 Line 14 Are Confidential Attorneys' Eyes Only

Page 174

1    drainage defect in the class vehicles, but you haven't

2    done so?

3        A.   It may be possible to do so.  I haven't

4    undertaken that --

5        Q.   All right.

6        A.   -- because I -- once I realized that I had

7    incomplete information, it was just pointless to

8    proceed.

9        Q.   Are you offering the opinion that all members

10   of the proposed class have suffered the fact of injury?

11       A.   I've been asked to assume that.

12       Q.   Okay.  Have you attempted to measure or

13   estimate the risk of a clogged sunroof drain in the

14   class vehicles?

15       A.   That's a technical question.  I have performed

16   no analysis regarding any technical matters.

17       Q.   No, I understand; but this is a precise

18   question.

19                Have you attempted to measure or estimate

20   the risk of a clogged sunroof drain in the class

21   vehicles?

22       A.   Well, that, to me, is a technical question.

23   It's the risk of a failure occurring, an event

24   occurring; and that has to do -- that's a technical

25   issue.  I haven't -- I -- I'm not qualified to make that